UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CRAIG L. DAVIS and YVONNE M.
DAVIS,

     Plaintiffs,

v.                                Case No.:  2:19-cv-780-SPC-NPM

LITTLE GIANT LADDER
SYSTEMS, LLC,

     Defendant.

_____/

## OPINION AND ORDER[1]

Before the Court are several Motions: Defendant Little Giant Ladder Systems, LLC's *Daubert*[2] Motion (Doc. 145); Little Giant's Motion for Summary Judgment (Doc. 146); and Plaintiffs Craig and Yvonne Davis' *Daubert* Motions (Docs. 156; 157). The parties filed various responses and replies. (Docs. 158; 159; 161; 163; 167). This case involves quite a bit of briefing and exhibits. Because the Court writes only for the parties (who are familiar with the facts), it only includes those necessary to explain the decision.

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them. The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

[2] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## BACKGROUND

This is a products liability action.  Little Giant makes Velocity ladders. These aren't that old wooden-rung variety.  Velocities are extendable and articulated, so users can set it to multiple heights and positions.  Craig owned one (the "Ladder").  A stock photo of a Velocity in A-Frame position follows:



(Doc. 145-1 at 2).

This case is all about the four orange Rock Locks near the top.  Users can adjust the Rock Locks, allowing the flared outer rails to telescope along the inner rails.  This allows setting a Velocity at different heights.  Rock Locks are not the only hinges though.  At the very top, the Hinge Locks on each side permit a user to fold a Velocity flat in an extension setting.

One day, Craig decided to hang Christmas lights above his garage.  So the Ladder needed to be in an extension configuration.  To do that, Craig

opened the Ladder on the ground, extended it, locked the Rock Locks, and set it against his house to judge its length.  Realizing he needed more height, Craig walked the Ladder back overhead with his hands.  He opened and closed the Rock Locks at the right height (on the first or second try).

Every Velocity warns consumers to secure all Rock Locks before use. Users ensure they locked a Velocity in two ways: they (1) listen for the Rock Lock to click in place; and (2) look to see if the Rock Lock is flush with the outer rail.  On that day, Craig—the only witness—heard the Rock Locks click and ensured they were flush.[3]  Then, he repositioned the Ladder, slung the lights over his shoulder, and climbed.

Near the roof fascia (about fifteen feet high), Craig fell.  Before falling, he heard a loud metallic clang and felt the rung drop.  After, the Ladder twisted.  Craig fell onto the driveway—suffering serious injuries.

At issue is Rock Lock safety.  Over the years Little Giant had four versions of that hinge (1.0, 2.0, 2.1, and 3.0).  Little Giant made the Ladder with 2.0 Rock Locks.  Because of a voluntary recall, however, it swapped the 2.0 for 2.1 Rock Locks before sale.  This action includes claims for design and manufacturing defects on negligence and strict liability theories (Counts 1 and

---

[3] Through briefing, counsel tries to massage the testimony to convey Craig merely "attempted," (Doc. 163 at 4-6, 9, 22), to check the Rock Locks and they "appeared flush," (Doc. 161 at 10, 22).  But that isn't how Craig testified.  He never filed an errata sheet.  And no affidavit tried to change the testimony after the fact.  So the Court relies on the evidence, not counsel's characterization of it.

2).   Craig also sues for failure to warn and breach of implied warranty of merchantability (Counts 3 and 4).   Finally, Yvonne seeks loss of consortium (Count 5).

## LEGAL STANDARD

Sitting in diversity, the Court applies federal procedural and Florida substantive law. *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1027 (11th Cir. 2017).   "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden to show the lack of genuinely disputed material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).   If carried, the burden shifts onto the nonmoving party to point out a genuine dispute. *Beard v. Banks*, 548 U.S. 521, 529 (2006).   At this stage, courts view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

4

**DISCUSSION**

To start, it is essential to orient Craig's theory of liability. Then, the analysis turns to the expert challenges before taking on the merits.

## A. The Theory

This case is about a "false lock." That condition exists when a Rock Lock barrel pin does not fully insert into the appropriate rung. Instead, the pin gets stuck on a swage ring (a raised lip around each rung hole). When that happens—says Craig—a user could believe the Rock Lock is engaged because the false lock sounds and feels like a Velocity would in a locked condition. Since a false locked barrel pin partially inserts, the Rock Lock does not appear fully unlocked and may look locked. A false lock can hold a climber's weight sometimes. But because the Rock Lock is not secure, a Velocity is prone to telescope if false locked. Below is what a false lock looks like under an x-ray:



(Doc. 156-6 at 2).

One must distinguish a false lock from a separate circumstance—unintentional disengagement. The difference between the two is more than "a battle of semantics" (as Craig calls it). (Doc. 156 at 8). Unintentional disengagement is when a fully secure Rock Lock comes unlocked during use. Little Giant had an issue with unintentional disengagement when it manufactured the Ladder, resulting in the recall. But not even Craig's expert believes that specific recall issue caused the incident.[4] (Doc. 146-1 at 42-43). So unlike the disagreement over whether to say Rock Lock 2.0 tall or Rock Lock 2.1, the difference between unintentional disengagement and false locking is meaningful.

At some point, litigants must pick their theories. For Craig, the theory is his injuries resulted from a false lock on the Ladder. In sum, the Ladder was never locked to begin with. So this case proceeds on a false lock theory.

Having clarified the issues, the Court tackles the Motions to exclude.

## B. *Daubert*

A witness who is qualified as an expert may testify with an opinion if:

> (a) the expert's . . . specialized knowledge will help the
> trier of fact to understand the evidence or determine a

---

[4] In the briefing, Craig waffles back-and-forth. At some points, he seemingly concedes false locks are different from unintentional disengagement. And in other places, Craig says they are one in the same. But expert testimony—not broad argument by counsel—is required on this matter. Both experts treat false locks and unintentional disengagement as separate issues. Any argument by counsel to the contrary is irrelevant.

> fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The trial judge serves as a gatekeeper—ensuring evidence is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589.

In determining the admissibility of expert testimony, the Court engages in a "rigorous" three-part inquiry. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).  It must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (citation omitted).  Though there is inevitable overlap among the inquiries, these are "distinct concepts and the courts must take care not to conflate them." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 851 (11th Cir. 2021) (citation omitted).

*Daubert* applies not only where an expert "relies on the application of scientific principles," but also where an expert relies "on skill- or experience-based observation." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).

The proponent of expert testimony always bears the burden on admissibility.

*Frazier*, 387 F.3d at 1244.

Mostly, the parties dispute reliability. A few questions aid that analysis:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). These factors are "illustrative, not exhaustive," so sometimes others may be more useful. *Frazier*, 387 F.3d at 1262. Though use and importance of the factors are case-by-case questions, the judge (as gatekeeper) must always ensure an expert's testimony "rests on a reliable foundation" before it is admitted. *Id.* at 1261 (quoting *Daubert*, 509 U.S. at 597).

District courts don't determine "the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Rather, the inquiry focuses on the reliability of the expert's methodology in making the opinions. *Id.* Of course, judges cannot supplant jurors. *Moore*, 995 F.3d at 850. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

With those principles in mind, the parties' challenges follow.

*1. Doc. 145*

Little Giant attacks Craig's expert—Peter Poczynok. There is much ink spilled on him. But at bottom, Little Giant's primary misgivings are matters for cross-examination, not a *Daubert* motion.

Much of Little Giant's challenge boils down to how Craig's testimony impacts the reliability of Poczynok's opinions. Craig testified several times the Ladder's Rock Locks were secure or flush before he fell. (Doc. 145-6 at 13, 15-16, 25-26). He answered discovery that way too. (Doc. 146-7 at 5). This is a big problem for Poczynok because his false lock theory means the barrel pin does not fully insert into a rung; so the Rock Lock isn't flush. (Docs. 145-4 at 45-47; 145-5 at 18-19, 29). To explain this contradiction, Poczynok said Craig might have been mistaken and not seen his Rock Locks were false locked. He based that assumption on Craig's other testimony of hearing a loud metal clang before the step dropped.[5] Given how the fall occurred, Poczynok assumes Craig was mistaken and the Rock Locks were not closed.

To be reliable, an expert's assumptions must be "supported by the record." *Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir.

---

[5] Craig's testimony on the order of these events was somewhat sketchy. (Doc. 145-6 at 20-21). What's more, Poczynok's belief the Ladder dropped "straight down," (Doc. 146-1 at 80), seems to conflict with Craig's story, (Doc. 145-6 at 20-21) (describing "twisting").

1993); *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1320 n.14 (M.D. Fla. 2015) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." (citation omitted)).  Put another way, the expert opinion "must be supported by more than subjective belief and unsupported speculation." *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1361 (N.D. Ga. 2017) (quoting *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th Cir. 2000)).

While thin, the record supports Poczynok's assumption.  From Craig's testimony on his fall, Poczynok opines the Rock Locks were false locked.  He adds false locks might be hard to see.  Surely, Little Giant lists many reasons to doubt him.  But it is not the Court's place to weigh evidence and decide who to believe—that's for the jury.  Little Giant is free to confront Poczynok on cross.  And the jurors will weigh all contradictions against his opinions.

So the Court mostly denies the *Daubert* Motion over Poczynok.

Yet the Motion succeeds to a limited extent.  It is unclear whether Poczynok intends to testify on what Craig might have seen the day of the fall.  At his deposition, Poczynok speculated Craig might have been mistaken because of eyesight, perception, or sun in his eyes.  But he cannot opine on such matters.  Craig neither offered nor disclosed Poczynok as an expert in human factors (or some related field).  Disclosure was not required, says Craig, because Poczynok can make assumptions from the record.  But experts can

10

only make reasonable assumptions to support their properly disclosed opinions—as discussed above. And failure to disclose aside, nothing in the record supports an assumption anything hampered Craig's ability to see the Rock Locks.

To be clear, Little Giant does not challenge Poczynok's ability to testify about his own perceptions of Rock Locks during this case and general opinions about perceiving a false lock. The Court will thus allow that narrow testimony (if elicited). But when it comes to Craig's perception during the incident, Poczynok cannot opine as an expert—or answer related hypotheticals—given the lack of disclosure and utter lack of record support.

So the Court grants in part the *Daubert* Motion on Poczynok.

### 2. Doc. 156

Next, Craig seeks to exclude Erick Knox (Little Giant's expert on causation and liability). This Motion only makes sense if one accepts Craig's staggering misrepresentations of the record. But disregarding those, the challenge fails.

Much of Craig's manufacturing defect position relies on his repeated argument the methodology is unreliable because Knox never measured the Ladder. As Knox explained in his deposition, he measured the Ladder and Rock Lock barrel pins. (Doc. 156-5 at 13, 100-01, 124-25). Knox's report contained all those measurements too. (Doc. 156-2 at 23). This supports his

opinion the Ladder had no manufacturing defect. What's more, Craig confusingly contends it is undisputed the Ladder was out of specification. But Little Giant disputes that fact. Finally, the rest of Craig's challenge amounts to disagreeing with Knox's opinions because Poczynok's testing and resulting conclusions differ. That is not a basis to exclude an expert.

As for the design defect, the attack fails. Craig argues Knox did not examine the Ladder's Rock Locks. Based on the record, that charge is false. Relatedly, Craig says Knox is unreliable because he failed to examine the 2.0 and 3.0 Rock Locks. But that is irrelevant. Knox offers no opinion on an alternative design. How another version operates, therefore, does not impact Knox's opinion on defects with the 2.1 Rock Lock or Ladder.

Last, the perfunctory challenge to Knox's first supplemental report fares no better. Again, mere disagreement with an expert is not a basis for exclusion. Likewise, if Craig attacks Knox's qualifications, such an argument falls flat.

So the Court denies the *Daubert* Motion for Knox. Going forward, Craig would do well to spend less energy on hyperbolic briefing and more time getting the facts straight.

   *3. Doc. 157*

Finally, Craig challenges the testimony of a Little Giant employee— Brian Russell. Right off the bat, part of the attack fails because it focuses on

opinions Russell won't offer (i.e., liability, causation, and testing the Ladder or an exemplar). So the Motion is moot in that regard.

As to the remaining portions, Craig finds no more success. Much argument assumes it is undisputed the Ladder was out of specification. Once more, Little Giant disputes that fact. Even if true, a manufacturing defect would not automatically render the Rock Lock 2.1 design defective, which Craig seems to imply. What's more, Craig contends Russell performed no tests to opine on the 2.1's safety. But as Little Giant's head of engineering, Russell knows about Rock Locks. And to opine on Rock Lock safety, Russell relied on American National Standards Institute ("ANSI") safety tests. Craig does not contend those tests are unreliable. Rather, his challenge boils down to disputed facts and credibility. But again, those are matters for the jury—not the Court—to resolve.

So the Court denies the *Daubert* Motion on Russell.

In short, almost all the expert evidence comes in, and the Court turns to the merits.

## C. Summary Judgment

Little Giant contends judgment is proper on each claim. The Court only agrees on two issues.

*1. All Claims*

To start, Little Giant moves for judgment on the assumption Poczynok's opinions would be excluded. Those opinions are mostly admissible. And there are genuine disputes of material fact. So Little Giant's argument fails.

*2. Count 3*

Next, Little Giant wants judgment on Craig's claim for failure to warn. On this basis, the Court agrees.

Florida recognizes failure to warn on theories of negligence and strict liability. *Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1369-70 (S.D. Fla. 2012). They are distinct though: negligence focuses on defendant's conduct, while strict liability emphasizes the product and plaintiff's expectations. *Id.* It is unclear which theory Craig pursues. All the same, both "boil down to three elements"—(1) "the warnings accompanying the item were inadequate"; (2) "the inadequacy of the warnings proximately caused" the injury; and (3) plaintiff "suffered injury by using the product." *Colville v. Pharmacia & Upjohn Co.*, 565 F. Supp. 2d 1314, 1320 (N.D. Fla. 2008).

The parties argue over three things. First, they dispute whether the warnings were inadequate. Second, they disagree on causation. And third, they debate if expert testimony is necessary. The Court takes each in turn.

Often, "the adequacy of warnings is a question of fact" for the jury. *Eghnayem v. Boston Sci. Corp.*, 873 F.3d 1304, 1321 (11th Cir. 2017) (cleaned

up).  But "it can become a question of law where the warning is accurate, clear, and unambiguous."  *Id.* (quoting *Felix v. Hoffman-LaRoche, Inc.*, 540 So. 2d 102, 105 (Fla. 1989)).   To be adequate, a warning "must make apparent the potential harmful consequences."  *Farias v. Mr. Heater, Inc.*, 684 F.3d 1231, 1233 (11th Cir. 2012) (citation omitted).  It must also "be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger."  *Id.* (citation omitted).  Warnings are judged "by a reasonable person standard," not "plaintiff's subjective appreciation of the danger."  *Id.* (citation omitted).  So a warning may be adequate if it "will convey to the typical user of average intelligence the information necessary to permit the user to avoid the risk and to use the product safely."  *Thomas v. Bombardier Recreational Prods., Inc.*, 682 F. Supp. 2d 1297, 1301 (M.D. Fla. 2010) (citation omitted).

As Little Giant argues, there is no evidence the warnings were anything but accurate, clear, and unambiguous.  In other words, they were adequate.

The Ladder itself carries several relevant warnings.  They say things like "ALL ROCK LOCKS MUST BE FULLY ENGAGED BEFORE USING THE LADDER" and "FAILURE TO FOLLOW DIRECTIONS MAY RESULT IN INJURY OR DEATH.  SECURE ALL ROCK LOCKS AND HINGES BEFORE CLIMBING."  (Doc. 145-6 at 47).  Echoing that sentiment, the Ladder warns "FOUR ROCK LOCKS MUST BE ENGAGED BEFORE USING THE

LADDER" and "LOCK ALL ROCK LOCKS AND HINGES." (Doc. 145-6 at 49). It also advises, "Adjust all hinges and Rock Locks before climbing. . . . Make sure all hinges and Rock Locks are securely engaged before climbing." (Doc. 145-6 at 51). The Ladder also shows a picture of locked and unlocked Rock Locks.

An instruction manual offers more. The manual tells users, "Unlock only one Rock Lock at a time" and "Make sure each Rock Lock is fully engaged into the appropriate rung tube before climbing the ladder. Failure to do so may result in injury." (Doc. 146-4 at 4-5). It reiterates: "Fully engage the hinge locks and Rock Locks before use, failure to do so may result in injury." (Doc. 146-4 at 4). Finally, the instructions inform how to put the Ladder in an extension configuration. This section explains, "Once you have extended the outer sections to the desired height, lock the Rock Locks. Always double check the two hinges and four Rock Locks to make sure they are fully locked and engaged." (Doc. 146-4 at 5).

A reasonable person reading these warnings would understand the importance of ensuing the Rock Locks are secure. Craig doesn't argue otherwise. Still, he contends the warnings are inadequate. It seems Craig believes the warnings fail because they do not say, "Rock Locks can false lock," "Rock Locks pose a hidden danger if not locked," or something similar. Not so. The warnings above repeatedly address the danger posed by false locking—

telescoping from the barrel pin not fully inserting into the rung. And they explain how to avoid the danger—making sure the Rock Locks are engaged. That's enough. *See Farias*, 684 F.3d at 1233 (warning "must make apparent harmful consequences" and prompt reasonable person to protect her safety "commensurate with the potential danger").

What's more, based on the evidence, the danger was not even hidden. Poczynok speculates the condition might be difficult to see. But every relevant photo offered shows a false lock. And Poczynok never measured how close to flush a Rock Lock can be while remaining false locked. So there is no evidence that a reasonable person heeding the warnings would not notice a false lock and correct it.

Craig places all his eggs in the basket of a single, unpublished case from another District. *Zaslow v. Louisville Ladder, Inc.*, No. 9:18-CV-80091-REINHART, 2019 WL 7376780 (S.D. Fla. Oct. 4, 2019). In *Zaslow*, a genuine dispute existed on whether a ladder's warning label addressed the way plaintiff was injured. The label warned, "Do not carry object(s) up or down which require both hands." *Id.* at *1. Because plaintiff was carrying an object with only one hand, the label did not clearly and unambiguously confront the situation.

The circumstances here differ. All warnings above alert to injury from not ensuring Rock Locks are completely in place before using the Ladder. Once

17

again, they raise the potential danger false locks pose and explain how to avoid the problem—ensuring the Rock Lock is fully secure.  Recall, Craig's incident resulted from a false lock, not unintentional disengagement.  No matter if the warnings are inadequate on unintentional disengagement, they are sufficient for a false lock.

Because the warnings were accurate, clear, and unambiguous, Count 3 fails.  Even if they were not—which would render them inadequate—Craig cannot show proximate cause.

Inadequacy alone is never enough: plaintiff must show the faulty warning proximately caused the injury.  *Eghnayem*, 873 F.3d at 1321.  This applies whether the theory is strict liability or negligence.  *Waite v. All Acquisition Corp.*, 194 F. Supp. 3d 1298, 1318 (S.D. Fla. 2016).  And general causation principles apply, even for a strict liability failure-to-warn claim.  *See Edward M. Chadbourne, Inc. v. Vaughn*, 491 So. 2d 551, 553-54 (Fla. 1986).  To establish proximate cause, "plaintiffs must show [it] is more likely than not that the defendant's act was a substantial factor in bringing about the injury."  *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1191 (11th Cir. 1995) (cleaned up).

As Little Giant argues, there is no genuine dispute that warnings (or lack of them) did not cause the injuries.  At his deposition, Craig repeatedly conceded he understood the warnings, knew how important it was to secure the Rock Locks, and locked them that day without a problem.  Confusingly,

Craig even testified he was not bringing a failure-to-warn claim because he thought the warnings were adequate. Given this, it cannot be said the warnings proximately caused Craig's injuries. *See Felix*, 540 So. 2d at 105 (holding no proximate cause when intermediary understood warnings and knew of warned danger).

Given the defects on inadequate warnings and proximate cause, Craig cannot show failure to warn.

Finally, if necessary to reach the parties' last argument (whether Craig needs an expert to prove Count 3), the Court agrees with Little Giant. Craig's failure-to-warn theory is based on the Rock Locks' ability to false lock. But the false lock, says Craig, stems from the design. Because an expert is necessary to understand the design and function of a Rock Lock, one is also needed to explain the defective warnings.

The facts here ordain that conclusion. Poczynok clarifies false locks can sometimes hold the users without the Ladder collapsing and guesses a false lock can be (but isn't always) obvious. What's more, ANSI testing shows securing just one Rock Lock can prevent telescoping. So an expert would be necessary to explain how it was inadequate to repeatedly warn users to check and double check all Rock Locks were secure.

What's more, an expert is probably necessary to explain how the condition is not open and obvious. If it is, then Little Giant owed no duty to

warn. *E.g.*, *Rodriguez v. New Holland N. Am., Inc.*, 767 So. 2d 543, 544-45 (Fla. Dist. Ct. App. 2000) ("However, there is no duty to warn of an obvious danger.").[6] Again, all photos showed visible false locks because the Rock Locks were not flush. *See Lugo v. Carnival Corp.*, 154 F. Supp. 3d 1341, 1346 (S.D. Fla. 2015) (holding a ladder not reaching the floor was open and obvious because reasonable person could see the condition). And any reasonable person using an extendable, articulating ladder would understand the importance of fully locking all hinges before use. *See Insua*, 913 So. 2d at 1264 (holding danger of electrical wires was so obvious manufacturer had no duty to warn).

As Craig does not offer an expert on failure to warn, he cannot prove Count 3. This alternative holding buttresses the conclusion above.

### 3. Punitive Damages

At last, the parties dispute whether Craig's punitive damages demand survives summary judgment. Given the standard of proof, it cannot.

In diversity cases, federal courts "apply state substantive law to determine whether there was sufficient evidence of conduct warranting punitive damages." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 771 F. App'x 991, 995 (11th Cir. 2019). But federal procedural law still applies.

---

[6] *John Morrell & Co. v. Royal Caribbean Cruises, Ltd.*, 534 F. Supp. 2d 1345, 1351 (S.D. Fla. 2008) ("Under Florida law, there is no duty to warn someone of an obvious danger."); *Veliz v. Rental Serv. Corp. USA, Inc.*, 313 F. Supp. 2d 1317, 1323 (M.D. Fla. 2003); *Insua v. JD/BBJ, LLC*, 913 So. 2d 1262, 1263-64 (Fla. Dist. Ct. App. 2005); *Siemens Energy & Automation, Inc. v. Medina*, 719 So. 2d 312, 314-15 (Fla. Dist. Ct. App. 1998).

*Global Quest*, 849 F.3d at 1027. Summary judgment "implicates the substantive evidentiary standard of proof that would apply at the trial." *Anderson*, 477 U.S. at 252. So the Court "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254-55.

To award punitive damages, plaintiff must show by "clear and convincing evidence" that "defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2); *see also Soffer v. R.J. Reynolds Tobacco Co.*, 187 So. 3d 1219, 1232 (Fla. 2016). Three concepts need context.

First, clear and convincing evidence is a high bar to clear. *See Jeep Corp. v. Walker*, 528 So. 2d 1203, 1205 (Fla. Dist. Ct. App. 1988) (noting "the Florida Supreme Court has all but eliminated punitive damages awards in products liability cases"). This is "an intermediate level of proof that entails both a qualitative and quantitative standard." *Owens-Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483, 486 n.4 (Fla. 1999) (cleaned up). To meet it, "evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy." *Id.* (citation omitted). The weight of the evidence must give jurors "a firm belief and conviction" as to the answer. *Lee Cnty. v. Sunbelt Equities, II, Ltd. P'ship*, 619 So.2d 996, 1006 n.13 (Fla. Dist. Ct. App. 1993) (citation omitted).

Second, "'Intentional misconduct' means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result." *Fla. Stat. § 768.72(2)(a).* What's more, "despite that knowledge," defendant "intentionally pursued that course of conduct resulting in injury or damage." *Id.*

And third, "'Gross negligence means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Fla. Stat. § 768.72(2)(b).* Make no mistake—run-of-the-mill negligence will not due. *White Constr. Co. v. Dupont,* 455 So. 2d 1026, 1028-29 (Fla. 1984); *Valladares v. Bank of Am. Corp.,* 197 So. 3d 1, 11 (Fla. 2016). Instead, "the character of negligence necessary to sustain a conviction for manslaughter is the same as that required to sustain a recovery for punitive damages." *Am. Cyanamid Co. v. Roy,* 498 So. 2d 859, 861 (Fla. 1986) (citation omitted).

Those three statutory terms control the analysis. But one must also remember the purpose of punitive damages: punishment (or retribution) and deterrence. *R.J. Reynolds Tobacco Co. v. Gafney,* 188 So. 3d 53, 57-58 (Fla. Dist. Ct. App. 2016); *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 492 (2008). And while expressed in countless iterations over the years, punitive damages are aimed at "egregious wrongdoing" society must condemn. *See Chrysler Corp. v. Wolmer,* 499 So. 2d 823, 824-25 (Fla. 1986); *Roy,* 498 So. 2d at 861; *see*

22

*also* Dan B. Dobbs et al., *The Law of Torts* § 483 (2d ed. June 2021 update) ("The inquiry must always be whether the defendant's conduct merits punishment as just dessert or shows the need for deterrence.").

Here, the evidence falls well short of that necessary to pursue punitive damages.

To start, the Velocity passed testing prescribed by the body that promulgates industry safety standards—ANSI. True, ANSI has no test for false locking. Nor do its standards contemplate that condition. So as the argument goes, compliance with ANSI does not support Little Giant's position. But Craig misunderstands the significance of ANSI testing.

Again, Craig's burden on punitive damages is high. At a minimum, he needs to show Little Giant's conscious disregard of, or indifference to, his safety. Yet Little Giant ran recommended safety testing, and the Velocity passed. Whether or not ANSI tests are sufficient, the fact Little Giant followed an industry-accepted process suggests it was not grossly negligent. *See McHale v. Crown Equip. Corp.*, No. 8:19-cv-707-T-27SPF, 2021 WL 808860, at *5-6 (M.D. Fla. Mar. 3, 2021) (holding ANSI compliance evidence militated against punitives).[7] These aren't only industry standards; the Occupational

---

[7] *See also Wolmer*, 499 So. 2d at 826-27; *Vairma v. Carnival Corp.*, No. 15-20724-CIV-SEITZ/TURNOFF, 2016 WL 2742400, at *2 (S.D. Fla. May 10, 2016); *Ivy v. Ford Motor Co.*, 646 F.3d 769, 777-78 (11th Cir. 2011); *Vazquez v. Raymond Corp.*, No. 2:17-CV-20-RWS, 2019 WL 176106, at *7 (N.D. Ga. Jan. 11, 2019).

Safety and Health Administration ("OHSA") incorporates ANSI standards. 29 C.F.R. pt. 1926, subpt. X, app. A. As the Eleventh Circuit put it, "compliance with both federal regulations and industry practices is some evidence of due care." *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) (applying Alabama law). Even though compliance controverts punitive damages, it is not dispositive alone. *Roy*, 498 So. 2d at 862-63 ("[C]ompliance with industry guidelines should not be taken as conclusive evidence" but "such information may certainly bear on whether a party's behavior represents such an extreme departure from accepted standards of care as to justify punitive damages").[8]

Next, Craig broadly contends Little Giant knew about the false locking defect and continued selling Velocity ladders. In other words, Little Giant disregarded customer safety. Craig's position falls into three buckets.

First, he argues Little Giant switched from the Rock Lock 1.0 to 2.0 only for cost savings (about $6 per Velocity). And internal documents from 2014 show initial concerns with a "[l]oose fit of pin in tapered cast hole." (Doc. 163, Ex. 8). From this, Craig believes a juror could infer Little Giant consciously disregarded safety in pursuit of profit. Not so.

---

[8] Little Giant says compliance raises a "presumption" against punitives. Yet neither the parties nor the Court located any law suggesting that is presumed. All the same, meeting industry standards and guidelines weighs against imposing punitive damages.

The Rock Lock at issue is the 2.1—not the 2.0. All the same, the documents cited don't only discuss cost savings. Rather, many factors spurred Little Giant to switch. These included price, durability, lighter weight, friction reduction, aesthetics, and easier production, inventory, and assembly. What's more, Little Giant created the documents over a year before approving the final 2.0 design. And there is no evidence about the final cost savings or if initial concerns remained with the final design. Nor does any evidence support Craig's assumption that concerns over loose fits affected false locks. Most important, nothing suggests Little Giant thought the Rock Lock 2.0 was any less safe. In short, this reasoning does little to support punitive damages.

Second, Craig asserts Little Giant knew about warranty claims related to wide outer rails for almost a year before investigating. When it did, Little Giant discovered the recall issue and learned it manufactured forty-one percent of Velocities too wide. An initial investigation "diagnosed *three potential causses* [sic] of [the] false locking problem." (Doc. 163 at 29). Rather than fix the issue, however, Little Giant was worried about losing money. So it merely changed the specifications on paper, redesigned the 2.0 pin, and did a shoddy job swapping 2.0 for 2.1 Rock Locks. In doing so, Little Giant did no quality control, measuring, or safety testing. There's a lot to unpack.

The warranty claims Craig cites provide no detail from which to draw any conclusions. These claims, spanning almost three years, do not suggest

users experienced false locks or even unintentional disengagement (i.e., the recall issue). As to the wide rails and investigating causes, Craig conflates the recall issue with false locking. Again, those are separate. And the record does not support an inference that Little Giant's knowledge of unintentional disengagement rendered it grossly negligent on the false lock defect. In response to the recall, unrebutted evidence specifies Little Giant changed manufacturing while inspecting, measuring, and testing Velocities, along with updating tolerances. What's more, the repeated charges over a "slapdash" job chiseling out 2.0 Rock Locks goes nowhere. (Doc. 163 at 29). Craig offers no evidence to question that process. Instead, the only testimony clarifies using a chisel was "a standard manufacturing technique." (Doc. 146-11 at 31). It is also "the cleanest and easiest way to remove a rivet without damaging any of the other components." (Doc. 146-11 at 31). This aggregate argument does not change the outcome.

And third, Craig says despite all this, Little Giant sold him the Ladder (which was out of specification) when a safer 3.0 design was available. According to Craig, Little Giant delayed manufacturing the 3.0 to use up the 2.1 inventory while continuing to make out-of-tolerance Velocities until late 2018. These points do not carry the day.

Again, the parties dispute whether the Ladder was within tolerance. And regardless, there is no indication Little Giant knew the Ladder was too

26

wide.   As to the 3.0, Craig's argument falls flat.   No expert—not even Poczynok—has an opinion on the 3.0's relative safety.   Nor can anyone opine the 3.0 cannot false lock.   Rather, Poczynok can only say a 3.0 false lock would be in a "different manner" than a 2.1 false lock.   (Doc. 146-1 at 53).   But it does not follow Little Giant withheld a safer product.   Even assuming Little Giant delayed the 3.0 (which is unclear from Russell's testimony), there is no evidence to suggest it knew the decision would likely result in injury.   *See* (Doc. 163-7 at 20).   Nor does Craig show Little Giant's conscious disregard or indifference for safety.   And evidence of other Velocities being out of tolerance does not move the needle.   Nothing outside bald speculation hints Little Giant had any notion of the recall issue or 2.1 Rock Locks posing a false lock hazard.

One final point.   The defect's nature shatters any basis for punitives. Once more, every scrap of evidence expresses users can see a false lock.   At worst, Little Giant assumed, consciously or not, users would notice when Rock Locks were not fully secure.   Given the 2.1 design and how users must adjust Rock Locks, this conduct did not meet the standard for gross negligence.

Simply put, a reasonable jury could not conclude this case warrants punitive damages by clear and convincing evidence.   So summary judgment is proper as to that demand.

Accordingly, it is now

**ORDERED:**

1. Defendant's *Daubert* Motion to Exclude the Testimony of Peter Poczynok (Doc. 145) is **GRANTED and DENIED in part**.

2. Defendant's Motion for Final Summary Judgment (Doc. 146) is **GRANTED and DENIED in part**.

    a. Count 3 is **DISMISSED with prejudice**.

    b. Defendant is **ENTITLED** to judgment on Plaintiffs' demand for punitive damages.

    c. The balance is **DENIED**.

3. Plaintiffs' Amended Motion to Exclude Expert Opinions of Erick Knox, P.E., Ph. D. With Line Designations (Doc. 156) is **DENIED**.

4. Plaintiffs' Amended Motion to Exclude Expert Opinions of Brian Russell with Deposition Line Designations (Doc. 157) is **DENIED**.

**DONE** and **ORDERED** in Fort Myers, Florida on March 4, 2022.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record